CASE *v.* HARRISON.

(In Banc. March 9, 1942. Suggestion of Error Overruled April 13, 1942.)

[6 So. (2d) 582. No. 34873.]

Neill, Clark & Townsend and C. C. Moody, all of India-
nola, for appellant.

**B. B. Allen**, of Indianola, for appellee.

Argued orally by **Don D. Townsend**, for appellant, and by **B. B. Allen**, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This suit is brought by a bill of complaint in chancery which contains grounds for equitable relief if shown to be true, and there is a cross-bill seeking affirmative relief in favor of the appellant on a $1,000 note for a personal loan made by him to the appellee and secured by certain collateral which was asked to be ordered sold and applied to the payment of the note, interest and attorney's fee, amounting to the total sum of $1,188.65 as found by the chancellor, but which indebtedness was decreed in favor of the appellant only as a credit on a 5% commission, amounting to the sum of $5,200, allowed to the appellee as a real estate broker on the sale of a plantation belonging to the appellant which was purchased in small units in December 27, 1940, by the Farm Security Administration, on behalf of certain tenant farmers selected and approved

by a County Committee under the supervision of such governmental agency, pursuant to an appraisal of the land theretofore made by its land appraiser for that purpose.

The appellee as a real estate broker had been authorized to sell the plantation at a price of $65 per acre, and in which event he was to receive the 5% commission provided for under a unilateral contract prepared by him in the form of a printed letter signed and delivered at his office at Moorhead by the appellant on October 2, 1939, the pertinent part of which reads as follows: "I hereby authorize you to offer for sale the property hereinafter described, and I agree to sell to any prospective purchaser you may furnish in accordance with the price and terms hereinafter set out, and allow you a commission as mentioned below in event you furnish a purchaser in accordance herewith (which then describes the land as being approximately 1700 acres, located near Blaine in Sunflower County, and gives the amount in cultivation, etc.). Price acre $65 cash . . . Commission you allowed for making this sale 5%. . . . I agree to furnish an abstract of title showing a good and merchantable title. (Then follows a printed township plat on which the governmental subdivisions of the land are checked.) This option to expire January 1, 1941. Yours truly E. C. Case."

The plantation consisted of 1676.82 acres and the price agreed to be paid therefor was the sum of $104,000, but this consideration was reduced to the sum of $100,600 when the deeds were executed, due to the fact that the title of one of the units contracted for, consisting of 54 acres and valued at $3,400, had failed, and with the result that the area of the land actually conveyed was 1622.82 acres. The price realized was therefore slightly less than $62 per acre, from which the appellant as grantor was required to pay all expenses of sale amounting to between $2,000 and $3,000 for title insurance, abstracts, attorney's fee, etc., whereas if the title to this 54 acre unit had not

failed, the grantor would have realized the said price of $104,000 first agreed upon for the entire tract of 1676.82 acres, a sum slightly in excess of $62 per acre.

The bill alleges that the defendant Case entered into a contract with the complainant Harrison on or about the 2d day of October, 1939, to sell this plantation, and agreed to pay him the 5% commission for making such sale to whatever purchaser he found for said land, but that complainant "has mislaid said agreement and has searched diligently for same and he is unable to locate it." However, it appears that the complainant later found the foregoing letter and introduced it at the trial as being the contract referred to in his bill of complaint and therein sued on.

The proof discloses that during the summer of 1939, one H. E. Chandler, a customer of the Farm Security Administration Program in Sunflower County, who had formerly lived on the Case plantation in question, learned that the said governmental agency desired to purchase some farm land to be sold to tenant farmers, and desiring to buy a farm for himself on this property, asked Harry Flowers, the county supervisor thereof in Sunflower County, to see the appellant and ascertain if this plantation was for sale. Thereafter, in August or September of that year, Flowers looked over the plantation in company with the appellant and found that he was willing to sell it and wanted a price of $65 per acre, but that otherwise he would sell for a price of $60 per acre net to him. Following this casual inspection of the property and discussion of the matter with the appellant, and prior to October 2, 1939, Flowers, in company with Barry Wood, the Land Appraiser of the said Farm Security Administration, and the appellant again drove over the land, when an unofficial appraisal was made by the said land appraiser to ascertain whether or not this governmental agency would be interested in purchasing it at a price for which the owner was willing to sell; and before any further steps were taken in that behalf, Flowers met the appellee on the

streets of Moorhead one Saturday afternoon and in the course of the conversation which ensued expressed his. interest in the appellant's plantation, and with the result that the appellee invited the appellant to his office the following Monday afternoon and then telephoned Flowers to come, stating to the appellant that he though he had a buyer for his plantation, and then procured from him the letter hereinbefore quoted from as his authority to sell the same. After the arrival of Flowers, it was finally agreed at the conference among the three of them that Flowers would take a ninety day option on the land for the benefit of the Farm Security Administration at $65 per acre, but desired that it be executed on the Government form, and they all then agreed this should be done on the next day by the appellant at the office of Flowers at Indianola. Such an option was accordingly executed, giving said Administration the exclusive right to purchase the land during that period for the price above stated. .

The evidence is in conflict as to whether the appellee's authority to sell the land was to be limited to a period of ninety days, but the chancellor found that such authority was to extend to January 1, 1941, the date shown by the foregoing letter, and rejected the contention that the true date had been erased and another substituted after the writing was delivered. We must therefore assume that the appellee was authorized to find a purchaser on the terms specified at any time prior to January 1, 1941, but it was conclusively shown that he accepted this written authorization with full knowledge and approved of the agreement that the appellant should give Flowers on the next day an exclusive option for the ninety day period, and the record is silent as to whether appellee ever made any effort either before or after the expiration of the ninety days to sell the land to any purchaser other than the Farm Security Administration at any price prior to the sale thereof made December 27, 1940, and it is not contended that he furnished a purchaser at any time prior

to the expiration of his contract on January 1, 1941, who was ready, willing and able to purchase the land on the terms specified under his authority to sell.

Following the execution of the ninety day option in favor of the Farm Security Administration, the said Harry Flowers, whom all of the interested parties knew was without discretion or authority to bind the proposed purchaser to buy the land, procured an official appraisal by the said Barry Wood within the time allowed, and with the result that the land was appraised at a value of less than $65 per acre, and the proposition to purchase it at the price authorized by the option was therefore not submitted to the County Committee for its approval. The appellant was accordingly notified by Flowers that the land could not be sold to the proposed purchaser at $65 per acre, and he testified that any thought of the land being purchased under the terms of this first option was thereupon fully abandoned before its expiration, and he suggested to the appellant that if he were willing to consider the price at which it had been appraised to let him know. Thereafter, on January 3, 1940, when the negotiations were no longer underway for a sale at $65 per acre, the appellant contacted Flowers and gave him another option to purchase the land for the lump sum of $104,000, the value at which the same had been officially appraised, and this option was later extended until the sale was finally consummated December 27, 1940, on that basis, less the amount deducted on account of the failure of title to one of the units, as hereinbefore stated.

It was also shown without dispute that the appellee had learned during the first ninety days, in conversation with Flowers, that the sale could not be made to the proposed purchaser at $65 per acre. As a witness, he was asked: "Immediately after the conversation in your office with Mr. Case and Mr. Flowers on October 2nd, Mr. Flowers stated to you, didn't he, that he did not think the Farm Security Administration would take the property at $65 an acre." His answer was: "He told me that on a

number of occasions." Moreover, he knew of the apprais-
al having been made, and should have known that the
County Committee was not authorized to buy the land
at a price in excess of the value fixed by the official ap-
praisement, and it nowhere appears in this record that
he ever made or suggested any subsequent agreement
with the appellant, whereby the terms of his employ-
ment were modified so as to entitle him to the 5% com-
mission in the event the land should be sold at a price
less than $65 per acre; nor is it alleged in his bill of com-
plaint that any agreement was ever entered into with the
appellant other than the contract sued on; and if that
written authority, which he found at his office subsequent
to the filing of the bill of complaint, had been filed as an
exhibit to the bill, the pleading would have been subject
to demurrer since the pleading showed on its face that
the land was sold for less than the price specified in his
contract—the agreement being to pay the commission
5% only "in event" he furnished a purchaser at $65 per
acre.

There was testimony on behalf of the appellee to show
that he was diligent during the first ninety day period
in his efforts to have the appraisal made without un-
necessary delay, and in his endeavor to obtain the cancel-
lation of an unexpired lease held by one Hughes on the
plantation, and in making frequent inquiries as to the
progress being made in connection with the proposed
sale; also that he had frequent conversations with the
appellant wherein the probability of having to reduce the
price was discussed, but without any new agreement be-
ing reached or proposed in regard to the collection of
his 5% commission in the event the appellant should find
it necessary to reduce the price in order to make the
sale; and that after the expiration of the first ninety day
period, he continued to make inquires as to the progress
of the negotiations then being conducted on the basis of
the reduced price, and that there were some remarks
made by the appellant during that time (while the appel-

lee was still interested in seeing this transaction closed as a means of affording some ready cash with which the appellant could buy other land in Arkansas that the appellee was then trying to sell him) which were construed by the appellee to indicate that the appellant was recognizing a liability to pay the commission. But, after a careful consideration of all of this testimony, we are of the opinion that these remarks were not sufficient to furnish a foundation for a recovery under the contract sued on in this case. They were made in connection with other proposed sales and constituted no part of a negotiation toward a modification of the original written agreement. Moreover, it was conclusively shown that while the option given the Farm Security Administration on October 3, 1939, resulted from the conference at the appellee's office on the day before it was taken as a prerequisite to obtaining an official appraisal of the land, and that unless the appraiser could have been induced to appraise its value at the price stipulated in the option, there was no service that either the broker or Flowers, the County Supervisor, could have rendered to bring about a recommendation from the County Committee for the purchase of the land at such price. Nor was there any service, so far as the record discloses, that either of them could have rendered subsequent to the official appraisement toward effecting the consummation of the sale for the price at which it was actually appraised to be worth, except the taking of the new option by Flowers from the appellant and keeping the same in force pending the decision. In other words, after the official appraisal was made and a new option taken by Flowers from the appellant on that basis, followed by the report of these facts to the County Committee, the matter was at an end so far as the services of a broker would be of any value. In fact, all services rendered by the broker as such were rendered prior to January 3, 1940, resulting in a failure to find a purchaser ready, willing and able to buy on the terms specified in his contract of employment. He could not, by merely

making inquiries from time to time as to how the negotiations were progressing, create a liability in his favor which did not otherwise exist to pay the commission on the reduced price at which the land finally sold.

The right of a broker to recover commissions or other remuneration for his services must be predicated on a contractual relation. 12 C. J. S., Brokers, p. 134, sec. 60. In the case of Kolb v. Land Company, 74 Miss. 567, 21 So. 233, 234, the defendant Kolb executed a writing, stating that he was the owner of certain lands (describing them) and authorizing and appointing the Land Company as his agent to sell the land, to the exclusion of all others, with the express understanding that they should have a commission of 10% of the consideration, stating that it should be $2,425, regardless of who effected the sale prior to January 1, 1896. Before that date and without notice to the Land Company, Kolb sold his lands himself for $2,000, and was sued for the 10% commission thereon. The Land Company had taken steps to obtain purchasers by advertising the land for sale and taking persons to see the property. The court denied liability, stating that the stipulations by Kolb were purely unilateral; that the Land Company had paid no valuable consideration, had entered into no correlative obligation, and that if it had taken no steps whatever in the execution of the purposes of the agency it would not have incurred any liability to Kolb; that he could not have sued for damages for nonperformance. The court stated, however, that "If it had obtained a purchaser, even with the assistance of Kolb, ready and willing to buy, then its rights would have been perfect under contract sustained by an executed consideration. Under the agency it may have had a claim for reimbursement for expenses and trouble incurred in its prosecution up to the time of notice of revocation. We do not decide this. But it does not sue for this. It sues on the alleged contract, as if it were a party to it, and as if it were based on consideration. An agent may proceed in the execution of such a power,

or not proceed as he chooses, and, if improperly thwarted by his principal, may, in a proper case, recover damages; but he cannot proceed under the stipulations of the power for commissions upon sale by the principal which was itself a revocation of the agency.'' In that case, the Land Company brought nobody to Kolb ready, able and willing to buy the lands on the terms specified, and the only distinction between that case and the one now before us is that Kolb sold to someone other than a prospective purchaser produced by the Land Company as a real estate broker, if it can be truly said that the Farm Security Administration was ever a prospective purchaser of the Case plantation as a price for which the appellee Harrison was authorized to produce a purchaser. The same rule was announced as to the rights of the parties when the owner executes a unilateral contract in favor of a real estate broker in the cases of Hollister v. Frellsen, 148 Miss. 568, 114 So. 385; Jayne v. Drake (Miss.), 41 So. 372; and Myers v. Coleman, 93 Miss. 226, 46 So. 249.

In the case of Swain v. Pitts et al., 120 Miss. 578, 82 So. 305, 306, it was held that brokers who were authorized to sell property at $265,000, and promised a certain amount as commission if they produced a purchaser at that price, were not entitled to a commission, though the person with whom they had negotiations at that price, and which ended in failure were abandoned so far as this price was concerned, where such proposed purchaser was later induced by the owner and a friend of his to buy the property at a reduced price; the court saying, among other things, that: ''After a careful consideration of the record, we have reached the conclusion that the appellees [the real estate brokers] had not procured a purchaser for the appellant on the terms named in the contract. We think there is no dispute on the evidence of the fact that Neely [the person produced by the appellees as a prospective purchaser and who later bought the land at the reduced price] had abandoned the idea of buying the property on any proposition made through Pitts & Weeks, and

that they never procured a purchaser within the provisions of the letter of October 27, 1917, above set out." The situation would have been different had Swain, the owner, reduced the price while negotiations were still pending through the real estate brokers to make a sale at $265,000, for the purpose of avoiding the payment of the commission contracted for; but the court observed that "We do not think that it can be gathered from the record of this case that the final deal between Swain and Neely was made for the purpose or with the object of defeating Pitts & Weeks of a commission, but we think on the evidence in this record that the negotiations instituted by Pitts & Weeks ended in a failure to make a sale, and that the subsequent deal was made without reference to the activities of Pitts & Weeks." Nor does it appear that the question presented there was as to which of two brokers was entitled to the commission. The record does not disclose that the friend of the owner who caused the negotiations to be renewed was a real estate broker or that he claimed any compensation for his services. It would seem that the result would have been the same had Swain himself renewed the negotiations and made the sale under the circumstances there involved. The vital point was that Pitts & Weeks, the real estate brokers, did not procure a purchaser on the terms specified.

In Roell et al. v. Offutt, 138 Miss. 599, 103 So. 239, it was held that where the terms of the sale which a real estate broker is authorized to make are not specified in the contract of employment and the actual sale is made by the principal, still the broker has performed the contract and is entitled to his commission when he produces a purchaser to whom the principal sells; citing the cases of Cook v. Smith, 119 Miss. 375, 80 So. 777; Jenny v. Smith-Powell Realty Co., 125 Miss. 608, 88 So. 171; Johnson v. Sutton, 94 Miss. 544, 49 So. 970; Delta & Pine Land Co. v. Wallace, 83 Miss. 656, 36 So. 263; and the court saying: "It is a question of what the contract was between the broker and his principal. If the terms are

specified, the broker does not earn his commission until he produces a purchaser ready, willing, and able to buy upon the terms specified.'' To the same effect are the cases of Skermetti Realty Co. v. Devitt et al., 145 Miss. 815, 111 So. 302; Stanley v. Grimes, 158 Miss. 1, 128 So. 324; and Reynold v. Alexander et al., 164 Miss. 860, 146 So. 305.

In the case of Tupelo Hotel Co. v. Long, 156 Miss. 337, 126 So. 6, the allowance of a commission on a sale made at a reduced price was affirmed by the court on appeal for the reason that the evidence was deemed sufficient to warrant the jury in finding that the sale would have been made at the price first stipulated for had not such cut in the price been made by the owner; whereas, in the case at bar it was conclusively shown that the plantation could not have been sold at the $65 per acre stipulated for and that the owner reduced the price for the sole reason that it was necessary to do so in order to make a sale at all.

In Ann. Cas. 1913E, 784-786, the general rule is stated, and then there follows the well-recognized exception to the rule, the general rule being that: ''The general proposition is well established that if property is placed in the hands of a broker for sale at a certain price, and a sale is brought about through the broker as the procuring cause, he is entitled to commissions on the sale even though the final negotiations were conducted through the owner, who, in order to make a sale, accepts a price less than that stipulated to the broker.'' Numerous cases are cited in support of this general rule under this annotation, and many such cases are likewise cited and quoted in the brief of the appellee in the present case. Then follows the exception to the rule which is stated as follows: ''It is elementary law that where a contract is made on a certain named condition, a party seeking to recover under the contract must bring himself within the condition. Therefore, when the contract expressly makes the payment of commissions depend on the obtaining of a certain price for the property, the broker cannot recover, even though

the owner sells at a less price to a person to whom the broker first shows the property, unless the broker is prevented from making the sale by the fault of the principal.'' This exception is as well established and supported by the authorities as is the rule itself.

Both the rule and the exception above stated are likewise stated substantially in the same manner in 4 R. C. L. 322, Sec. 59, 43 A. L. R. 1104-1111, and 47 A. L. R. 856, Annotation Note, wherein it is said in the latter note that the recent cases support the rule that when the owner of property who has placed it with a broker for sale at a certain price sells the property to a broker's customer at a reduced price, he is liable to the broker for his commission, but that ''Where the contract expressly makes the owner's liability contingent on the obtaining of a certain price or terms, the broker may not recover when the owner sells to, or trades with, the broker's customer on less favorable terms.'' See also Backman v. Guadalupe Realty Co., 78 Cal. App. 347, 248 P. 296; 8 Am. Jur. 1101, Sec. 190; and 12 C. J. S., Brokers, pp. 196, 197, Sec. 86, Subsection B.

Applying the foregoing authorities, it will be noted, from the language of the writing hereinbefore mentioned which authorizes the appellee to sell the property, that the appellant states that ''I agree to sell to any prospective purchaser you may furnish in accordance with the price and terms hereinafter set out, and I will pay you a commission as mentioned below in event you furnish a purchaser in accordance herewith.'' The words ''in event,'' in our opinion, make the agreement to pay the commission depend upon the broker furnishing a purchaser ready, willing and able to buy the property at $65 per acre. The broker does not contend that he furnished such a purchaser, nor is it contended that the execution of the second option at a reduce price on January 3, 1940, in favor of the proposed purchaser, in anywise prevented or interfered with any sale that the broker may have been able to make on the terms at which he had been

authorized to sell under his contract of employment; and there were no facts disclosed by the record that would tend to create a suspicion that the appellant reduced the price for the purpose of avoiding the payment of a commission.

Therefore, the decree of the court below allowing the commission in favor of the appellee must be reversed and judgment rendered here on that issue in favor of the appellant, dismissing the bill of complaint; and the cause will be reversed and remanded for the rendition of the proper decree under the cross-bill for the sale of the collateral pledged to pay the indebtedness found by the chancellor to be due the appellant on the $1,000 note for the loan made by him to the appellee.

Reversed and decree here dismissing the bill of complaint; and reversed and remanded for relief under the cross-bill.