# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01607-SCT

*BILLY M. HAMILTON*

*v.*

*GERALD J. HOPKINS,*
*GAY T. HOPKINS AND*
*BUYER'S AGENT OF THE*
*MISSISSIPPI GULF COAST, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/1/2001 |
| TRIAL JUDGE: | HON. THOMAS WRIGHT TEEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | FELICIA DUNN BURKES |
| ATTORNEYS FOR APPELLEES: | WAYNE L. HENGEN |
| | WOODROW W. PRINGLE, III |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 01/09/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., WALLER AND GRAVES, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     Gerald J. and Gay T. Hopkins, as sellers, sued Billy M. Hamilton, as buyer, for breach of a real estate sales contract. Hamilton's broker, The Buyer's Agent of the Mississippi Gulf Coast, Inc., intervened, seeking a 3% commission. Hamilton counterclaimed for refund of the earnest money deposit and payment of attorney's fees. The Chancery Court of the Second Judicial District of Harrison County held that the Hopkinses could not recover punitive damages, the Hopkinses could recover their attorney's fees in

prosecuting this action, The Buyer's Agent could recover its commission of $3,750, and Hamilton could not recover his earnest money deposit. We affirm the chancellor on all points except for the award of attorney's fees and commission, which we are compelled to reverse and render for lack of a legal or contractual basis for such awards.

## FACTS AND PROCEDURAL HISTORY

¶2. On January 21, 1998, Billy M. Hamilton entered into an agency agreement with The Buyer's Agent of the Mississippi Gulf Coast, Inc., and agent Cynthia Pringle to assist him in purchasing a home. The Hopkinses listed their home in Biloxi, Mississippi, with Carolyn Catchot of Century 21 Bay South Realty, Inc. in July of 1998. On July 15, 1998, The Buyer's Agent submitted an offer on behalf of Hamilton to the Hopkinses to purchase their home. The Hopkinses accepted the offer and signed the contract on July 16, 1998. The contract, which was prepared by The Buyer's Agent, provided for, inter alia, a purchase price of $125,000, an earnest money deposit of $1,000, and a closing date of August 31, 1998.

¶3. A home inspection conducted pursuant to the contract revealed problems with the heating, venting, and air conditioning (HVAC) systems. In response, the Hopkinses hired Charles Williams, a licensed heating and cooling contractor, to service the HVAC units. Williams performed the routine maintenance, cleaned off the normal accumulation of rust, and replaced one thermostat. After the servicing, Williams found that the units operated normally.

¶4. Beth Harriel, a broker for The Buyer's Agent, received Williams's report from Catchot and notified Hamilton. She noted that the results of the evaluation were satisfactory to Hamilton and that he wanted to move into the house by July 24 if possible. However, Hamilton contends that he told Harriel that he wanted the Hopkinses to replace the HVAC units or lower the price in an amount to cover their replacement.

2

¶5.    On August 24, one week before the scheduled closing, Hamilton contacted Harriel and told her that he would not be needing the house because he had a job requiring him to travel.  No mention was made of the HVAC units.  At trial, Hamilton testified that he inquired of Harriel about lowering the price; however, Harriel denied having any knowledge of this.  Hamilton further testified that he previously made these very same inquiries of Cynthia Pringle but was unable to contact either Pringle or Harriel during the preceding month.  Harriel told Hamilton he should have contacted her earlier if he wanted to back out, but Hamilton asserts that he made it clear to Pringle that he would purchase the house if the price was lowered.

¶6.    Hamilton contacted Catchot, informing her of his decision not to purchase the house.  According to Catchot, Hamilton made no mention of the HVAC units.  He likewise faxed The Buyer's Agent on August 28 in confirmation of his August 24 conversation with Harriel that he would not be purchasing the house.  Hamilton again made no mention of the HVAC units.

¶7.    Hamilton did not appear at the August 31 closing.  During the days preceding the closing, Hamilton was looking for another house and subsequently found one on August 27.  He signed a contract for that new house on September 1, 1998, and closed within the next two months.

¶8.    The Hopkinses sued Hamilton on November 5, 1998, alleging breach of the July 16, 1998, contract and seeking specific performance or damages[1] and attorney's fees. The Buyer's Agent intervened in the action, seeking the 3% commission allegedly due under its contract with Hamilton.  Hamilton answered and filed a counterclaim seeking a return of the earnest money deposit and payment of attorney's

---

[1]The specific actual damages the Hopkinses sought were:  $2,000 for the difference in the original contract price and amount received in the later sale of the house; $360 for maid service; $655 for lawn and pool service; $1,184.24 for interest on a home equity loan; $200 for storage unit rental; $276.80 for taxes; $239.29 for homeowners' insurance; $205 for pest control service; $1,135.84 for electric bills; $81 for water and sewage service; interest on the proceeds of sale they would have received; and lost wages.

fees. The parties stipulated to a partial dismissal of the claim for specific performance since the Hopkinses had sold the house to another buyer.

¶9.    The chancery court entered summary judgment on the claim for breach of contract based on the liquidated damages provision.[2] The chancery court also allowed the Hopkinses to amend their pleadings to allege tortious breach of contract, proof of which could entitle the Hopkinses to punitive damages and attorney's fees.

¶10.    Following a trial, the Hopkinses were awarded $7,625 plus interest in attorney's fees. The Buyer's Agent was awarded its broker's fee of $3,750 plus interest. All other relief, most notably punitive damages, was denied.

¶11.    Hamilton appeals and asserts the following issues:

> **I.     WHETHER THE CHANCELLOR ERRED IN AWARDING ATTORNEY'S FEES TO THE HOPKINSES.**
>
> **II.    WHETHER THE CHANCELLOR ERRED IN ENTERING JUDGMENT FOR COMMISSION IN FAVOR OF THE BUYER'S AGENT.**

---

[2]Paragraph 12 contained the liquidated damages provision:

12. BREACH OF CONTRACT. Specific performance is the essence of this contract . . . and time is of the essence of this contract: (a) *In the event of breach of this contract by Purchaser, Seller shall accept the earnest money deposit as liquidated damages and this contract shall then be null and void*, (b) In the event of breach of contract by Seller, Purchaser at his option may either accept the return of the earnest money deposit and cancel the contract or enter suit for damages in any court of competent jurisdiction or enter suit in any court of competent jurisdiction for specific performance. If it becomes necessary to insure the performance of the conditions of this contract for purchaser to initiate litigation, then the losing party agrees to pay reasonable attorney's fees and court costs in connection therewith.

(emphasis added).

4

**III.** **WHETHER THE CHANCELLOR ERRED IN DENYING HAMILTON'S COUNTERCLAIM FOR REFUND OF EARNEST MONEY AND ATTORNEY'S FEES.**

The Hopkinses, as cross-appellants, assert the following issue:

**IV.** **WHETHER THE CHANCELLOR ERRED IN DENYING THE HOPKINSES' DEMAND FOR PUNITIVE DAMAGES.**

## STANDARD OF REVIEW

¶12. We will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, applied an erroneous legal standard, was manifestly wrong, or was clearly erroneous. *Cox v. F-S Prestress, Inc.*, 797 So. 2d 839, 843 (Miss. 2001); *Holloman v. Holloman*, 691 So. 2d 897, 898 (Miss. 1996).

## DISCUSSION

**I.** **WHETHER THE CHANCELLOR ERRED IN AWARDING ATTORNEY'S FEES TO THE HOPKINSES.**

¶13. Hamilton asserts that the chancellor erred in awarding attorney's fees to the Hopkinses. Paragraph 12 states that, with regard to attorney's fees, "If it becomes necessary to insure the performance of the conditions of this contract for purchaser to initiate litigation, then the losing party agrees to pay reasonable attorney's fees and court costs in connection therewith."[3] Contrary to the chancellor's holding, we conclude that it was error to award attorney's fees to the Hopkinses.

¶14. Both parties go to great lengths in their briefs to illustrate that they "won" and are therefore entitled to payment of attorney's fees under the contract. The Hopkinses contend that, although they did not prevail

---

[3]The complete text of Paragraph 12 dealing with breach of contract can be found in note 2.

on every issue, they did succeed in getting the earnest money as liquidated damages. On the other hand, Hamilton contends that he won since the claim for specific performance was dismissed and the Hopkinses lost on their claim for damages for an intentional tort of breach of contract.

¶15.    A close reading of the pertinent contract terms does not require a determination of which party prevailed. The contract provided, "If it becomes necessary to insure the performance of the conditions of this contract for *purchaser* to initiate litigation, then the losing party agrees to pay reasonable attorney's fees and court costs in connection therewith." (emphasis added). Both the chancellor in his opinion and Hamilton in his brief quote the clause as "necessary to insure the performance of the conditions of the contract for *purchase* to initiate litigation . . . ." (emphasis added). Reading the contract as the chancellor did would naturally entail a determination of which party prevailed, since it assumes that either party could initiate litigation and be entitled to attorney's fees and costs. Under such an interpretation, whichever party in this "contract for purchase" was the "losing party" would be required to pay attorney's fees and costs.

¶16.    We have held that parties may contractually provide that in the event of a dispute, the losing party will be charged with paying attorney's fees. ***Theobald v. Nosser***, 752 So. 2d 1036, 1042 (Miss. 1999) (citing ***Grisham v. Hinton***, 490 So. 2d 1201, 1206 (Miss. 1986)). However, a fair reading of this clause reveals that the right to payment of attorney's fees was contingent on the purchaser, i.e., Hamilton, initiating litigation. This contract, prepared by The Buyer's Agent, contemplated in Paragraph 12 that the seller was to accept the earnest money deposit as liquidated damages. We are, after all, obligated to enforce a contract when its terms are clear and unambiguous. ***Ivison v. Ivison***, 762 So. 2d 329, 334 (Miss. 2000); ***Gulfside Casino P'ship v. Miss. State Port Auth. at Gulfport***, 757 So. 2d 250, 256 (Miss. 2000); ***Delta Pride Catfish, Inc. v. Home Ins. Co.***, 697 So. 2d 400, 403 (Miss. 1997); ***Century 21 Deep***

6

***S. Props., Ltd. v. Keys***, 652 So. 2d 707, 717 (Miss. 1995). Also, if attorney's fees are not authorized

by the contract or by statute, they are not to be awarded when an award of punitive damages is not proper.

***Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.***, 743 So. 2d 954, 971 (Miss.

1999); ***Miss. Dep't of Wildlife, Fisheries & Parks v. Miss. Wildlife Enforcement Officers'***

***Ass'n***, 740 So. 2d 925, 937 (Miss. 1999); ***Century 21 Deep S. Props., Ltd. v. Corson***, 612 So. 2d

359, 375 (Miss. 1992); ***Smith v. Dorsey***, 599 So. 2d 529, 550 (Miss. 1992); ***Grisham v. Hinton***, 490

So. 2d 1201, 1205 (Miss. 1986); ***Stanton & Assocs., Inc. v. Bryant Constr. Co.***, 464 So. 2d 499,

502 (Miss. 1985); ***Bellefonte Ins. Co. v. Griffin***, 358 So. 2d 387, 391 (Miss. 1978).

¶17.     Here, an award of attorney's fees to the sellers was not authorized by the contract or statute.

Further, as discussed below, an award of punitive damages was not warranted on these facts. Therefore,

the chancellor erred as a matter of law in awarding attorney's fees to the Hopkinses.

**II.     WHETHER THE CHANCELLOR ERRED IN ENTERING JUDGMENT FOR COMMISSION IN FAVOR OF THE BUYER'S AGENT.**

¶18.     Hamilton next contends that the chancellor erred in awarding a 3% commission to The Buyer's

Agent.  The commission clause  provides that Hamilton will pay The Buyer's Agent the commission at the

time of closing from the proceeds of the sale:

> 10.  COMMISSION.  The parties hereby agree that The Buyer's Agent [] is the procuring cause of this contract and is therefore entitled to a commission.  As a part of this contract and being due and payable through the terms of this contract, the Seller understands that this offer to purchase is contingent on The Buyer's Agent [] receiving a fee derived *from the proceeds of the transaction* in an amount equal to 3% of the final purchase price to be paid to The Buyer's Agent [] *at the time of closing* on behalf of the purchaser.  The Buyer's Agent [] is receiving no compensation from the seller's representative.

(emphasis added). Hamilton contends that since there was no closing, The Buyer's Agent is not entitled to a commission.

¶19. Mississippi case law on the issue of broker commission has almost exclusively dealt with a broker representing a seller who demands a commission for locating a buyer, rather than a broker representing a buyer who demands a commission for locating a seller. *See Varner Real Estate, Inc. v. Bobb*, 491 So. 2d 528 (Miss. 1986); *Minter v. Hart*, 208 So. 2d 169 (Miss. 1968); *Crichton v. Halliburton & Moore*, 154 Miss. 265, 122 So. 200 (1929); *Lizana v. Brown Realty Co.*, 146 Miss. 758, 111 So. 867 (1927); *Hays v. Goodman-Leonard Realty Co.*, 146 Miss. 766, 111 So. 869 (1927); *Long v. Griffith*, 113 Miss. 659, 74 So. 613 (1917).

¶20. The general rule of brokerage contracts is that when a principal and a broker enter into a contract and the contract "specifies the price and terms of sale, the agent performs his duty, and is entitled to a commission, when he procures a purchaser ready, willing and able to buy, even though the owner may then decline to sell." *Varner Real Estate*, 491 So. 2d at 529 (quoting *Partee v. Pepple*, 197 Miss. 486, 20 So. 2d 73, 78 (1944)); *Lizana*, 111 So. at 868; *Hays*, 111 So. at 870. Many of these listing agreements, however, were either oral[4] or written, but made no specific provision for precisely when the commission was due. *See, e.g., Minter v. Hart*, 208 So. 2d 169 (Miss. 1968) (providing only for payment of commission of 6% of purchase price).

---

[4]A listing agreement can be oral and is not subject to the statute of frauds when separate and not included in a contract for the sale of land. *See Minter v. Hart*, 208 So. 2d 169, 170 (Miss. 1968) (citing *Partee v. Pepple*, 197 Miss. 486, 20 So. 2d 73 (1944); *Lizana v. Brown Realty Co.*, 146 Miss. 758, 111 So. 867 (1927)).

¶21.    In awarding the commission to The Buyer's Agent, the chancellor relied on Mississippi case law in which a commission was awarded to a broker for representing a seller when, in the instant case, a broker is demanding a commission for representing a buyer.  He also cited *Magnolia Fed. Sav. & Loan Ass'n v. Randal Craft Realty Co.*, 342 So. 2d 1308 (Miss. 1977), which applied quasi-contractual principles to justify awarding an $11,500 commission.  The chancellor specifically held that Hamilton owed a commission to the Buyer's Agent because it fulfilled all of its duties up to closing by finding a house accepted by Hamilton and preparing a contract which Hamilton signed:

> [T]hey had a legal relationship implying that [The Buyer's Agent] would be compensated for real estate work for Hamilton.  [The Buyer's Agent] in fact did find a house, find one that Hamilton accepted, prepared the offering contract which Hamilton signed, and handled the agency duties until the proposed closing.  By breaching the Hopkins contract, Hamilton breached [The Buyer's Agent] contract as well.

¶22.    Contrary to the chancellor's holding, the "ready, willing and able" rule is not dispositive on this issue. The contract contained a specific provision providing when the commission became due, specifically, "at the time of closing" and "from the proceeds of the transaction."  In Hamilton's case, The Buyer's Agent is bound to the specific terms of the contract.

> Unlike a real estate broker's general contract of employment, a special contract of employment imposes conditions upon the real estate broker's right to a commission.  A broker may by special agreement make the payment of commission dependent upon a contingency, or the happening of a condition precedent, and unless that contingency occurs or the contingency happens, or its performance is excused, there is no right to recovery.  Likewise, a seller is entitled to prescribe any lawful condition on the real estate broker's right to a commission to which the parties consent, notwithstanding the general rule that the broker is entitled to a commission if the broker is the procuring cause of the sale.

9

23 Richard A. Lord, *Williston on Contracts* § 62:19, at 380-81 (4th ed. 2002) (footnotes omitted).[5]

*See **Hill v. Capps***, 248 Miss. 601, 613-14, 160 So. 2d 186, 191 (1964) (holding that "[i]n the absence of a special agreement, if the services are performed in good faith, the broker is entitled to fair and reasonable compensation"). *See also **R.J. Kuhl Corp. v. Sullivan***, 17 Cal. Rptr. 2d 425, 431 (Cal. Ct. App. 1993) (stating that "parties to a brokerage contract are at liberty to adopt provisions making compensation depend upon any lawful condition stated"). In this case, The Buyer's Agent negotiated a contract including a term specifically stating when and how its commission would be computed. We will enforce a contract when its terms are clear and unambiguous. If The Buyer's Agent wanted its commission contingent on procuring a seller ready, willing and able to consummate the transaction, it very easily could have contracted for as much. Such not being the case, The Buyer's Agent is not entitled to a commission, and we reverse the chancellor on this issue.

## III. WHETHER THE CHANCELLOR ERRED IN DENYING HAMILTON'S COUNTERCLAIM FOR REFUND OF EARNEST MONEY AND ATTORNEY'S FEES.

---

[5] Also with regard to conditions on payment of a commission:

A broker employed to buy, sell, or exchange property may be engaged on such terms that he is not entitled to compensation until the closing or transfer or passing of title, or until the passing of papers for the sale of property. A broker is not entitled to his commission where he waived his fee, for procuring a mortgage loan, in the event the mortgage does not close.

*A provision that the broker is to receive commission on the closing or transfer of title, or when the sale or title is closed, makes the occurrence of such event a condition precedent to the right to recovery*, and the existence of a provision in a contract for the exchange of property that the commission is due on the signing of the agreement does not defeat the operation of the rule.

12 C.J.S. *Brokers* § 151, at 451-52 (1980) (footnotes omitted) (emphasis added).

10

¶23.    Hamilton asserts that he is entitled to a return of his earnest money deposit and payment of his attorney's fees because of his dissatisfaction with the inspection and service of the HVAC units. Specifically, Hamilton refers to Paragraph 15 which states, in pertinent part, "If inspection is found to be unsatisfactory to Purchaser, because defects in the structures, systems or elements are discovered, the Purchaser shall not be obligated to complete the purchase of property herein described and all earnest money will be refunded to the Purchaser." The Hopkinses, however, assert that there was little evidence to support Hamilton's claims and that his breach was untimely and unsupported. We agree with the Hopkinses.

¶24.    Hamilton testified that he attempted to contact Harriel and Pringle from August 1 to August 24 to tell them he would not purchase the property without a reduction in price or replacement of the HVAC units. The Hopkinses knew that Hamilton was acting through an agent, namely, The Buyer's Agent, throughout the process. A real estate agent is a special agent of its principal and is vested with limited powers. *Blanks v. Sadka*, 241 Miss. 821, 133 So. 2d 291, 293 (1961) (citing *Shemper v. Latter & Blum, Inc.*, 214 Miss. 113, 58 So. 2d 359 (1952)). If Hamilton wished to rescind the contract due to the perceived defects in the HVAC units and recover his earnest money deposit, he would have had to communicate that to The Buyer's Agent, which would, in turn, communicate it to the Hopkinses' agent. Hamilton's intention to rescind was not communicated to the Hopkinses until two days prior to the August 31 closing, at which time the Hopkinses had already moved out of the house early at Hamilton's request. This notification two days prior to closing, while arguably timely, was not fair to the Hopkinses, and the chancellor's refusal to return to Hamilton the earnest money deposit was a reasonable exercise of his equitable power, for equity regards as done that which should be done. *Harris v. Kemp*, 451 So. 2d 1362, 1366 (Miss. 1984); *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 208 (Miss. 1984); *Mahaffey v.*

11

*First Nat'l Bank*, 231 Miss. 798, 97 So. 2d 756, 765 (1957). After the Hopkinses moved out early at Hamilton's request, it would not be equitable to deny the Hopkinses the liquidated damages, the only damages to which they are entitled, simply because Hamilton was unable to contact his agents of his desire not to consummate the deal.

## IV. WHETHER THE CHANCELLOR ERRED IN DENYING THE HOPKINSES' DEMAND FOR PUNITIVE DAMAGES.

¶25. The Hopkinses, as cross-appellants, allege that the chancellor erred in refusing to award punitive damages. Specifically, they assert that Hamilton intentionally refused to close on the sale of the house which was an intentional wrong and in reckless disregard of the Hopkinses' rights. We agree with the chancellor that punitive damages were not appropriate in this case.

¶26. To qualify for punitive damages in a breach of contract case, a plaintiff must prove by a preponderance that the breach was the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard of the plaintiff's rights. *Paracelsus Health Care Corp. v. Willard*, 754 So. 2d 437, 442 (Miss. 1999); *Hurst v. Southwest Miss. Legal Servs. Corp.*, 708 So. 2d 1347, 1350 (Miss. 1998); *Am. Funeral Assurance Co. v. Hubbs*, 700 So. 2d 283, 286 (Miss. 1997); *Dynasteel Corp. v. Aztec Indus., Inc.*, 611 So. 2d 977, 985 (Miss. 1992); *Eselin-Bullock & Assocs. Ins. Agency, Inc. v. Nat'l Gen. Ins. Co.*, 604 So. 2d 236, 241 (Miss. 1992); *Blue Cross & Blue Shield of Miss., Inc. v. Maas*, 516 So. 2d 495, 496 (Miss. 1987).

¶27. The Hopkinses argue that Hamilton's breach was not an honest mistake and that he chose to breach the contract. They list their actual damages incurred as evidence of Hamilton's amenability to punitive damages. While it is true that Hamilton willingly chose not to complete the contract, there is no evidence he acted maliciously or in reckless disregard of the Hopkinses' rights. Hamilton testified that he

12

unsuccessfully tried to contact Harriel and Pringle from August 1 to August 24 to tell them he would not purchase the property without a reduction in price or replacement of the HVAC units. The Hopkinses have failed to carry their burden of proof; and therefore, such circumstances do not rise to the level of an independent tort permitting imposition of punitive damages. The chancellor's denial of all other relief was supported by substantial evidence, and we will not disturb it. *See Wright v. Roberts*, 797 So. 2d 992, 997 (Miss. 2001).

## CONCLUSION

¶28.  We reverse the chancellor's award of attorney's fees to the Hopkinses and a commission to The Buyer's Agent, and we render judgment here finally denying the Hopkinses' claim for an award of attorney's fees and the claim of The Buyer's Agent for a commission. We affirm the judgment below in all other respects.

¶29.  **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PITTMAN, C.J., SMITH, P.J., COBB, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**